## EDGAR et al. v. RIO GRANDE WESTERN RY. CO.

No. 1789.    Decided June 5, 1907 (90 Pac. 745).

1. MASTER AND SERVANT—INJURIES TO SERVANT—SUFFICIENCY OF EVIDENCE—NEGLIGENCE OF MASTER. In an action against a railway for the death of a fireman, caused by the engine running into an open switch, where the evidence leaves it uncertain as to whether defendant or some unknown party was responsible for leaving the switch open, a recovery cannot be had on that ground.[1]

2. SAME—ACTS CONSTITUTING NEGLIGENCE — PROXIMATE CAUSE. Where a locomotive fireman was killed by the engine running into an open switch, which defendant had left unlocked, though its responsibility for leaving it open was not shown, leaving the switch unlocked was not a proximate or concurring cause of the injury.

APPEAL from District Court, Third District; George G. Armstrong, Judge.

Action by Jennie Edgar and others against the Rio Grande Western Railway Company. From a judgment for defendant, plaintiffs appeal.

AFFIRMED.

*Warner & Davis* for appellants.

*Sutherland, Van Cott & Allison* and *W. D. Riter* for respondent.

---

[1] Fritz v. Electric Light Co., 18 Utah 493, 56 Pac. 90.

APPELLANT'S POINTS.

If the facts proven are such that reasonable men may fairly differ as to whether or not there was negligence, the question is one for the jury to consider. In support of this rule we cite the following. *Lowe v. Salt Lake City,* 13 Utah 98; *Reese v. Morgan S. M. Co.,* 15 Utah 460; *Pool v. Southern Pacific Co.,* 20 Utah 214; *Peck v. Railroad,* 25 Utah 32; *Whitney Mnfg. Co. v. Railroad,* 37 Am. St. 771.

"When an injury is the combined result of the negligence of the defendant and an accident for which neither the plaintiff nor the defendant is responsible, the defendant must pay damages, unless the injury would have happened if the defendant had not been negligent." In support of this we cite the following: 7 Amer. & Eng. Ency. Law (1 Ed.), p. 828; *Town v. Railroad,* 47 N. W. 665; *Railroad v. Wymant, supra;* 2 Thomp., Neg., p. 1085, sec. 3. 1st Ed. 16 Amer. & Eng. Ency. Law (1 Ed.), pp. 440-441; *Carterville v. Cook,* 129 Ill.—; *Palmer v. Inhabitants of Andover,* 2 Cush, 600; *Railroad v. House,* 50 N. E. 151; 24 Am. St. 756, 760.)

To hold a master responsible for the death of a servant there must be some substantive proof of negligence. Mere surmise, conjecture, or speculation will not take the place of such proof. (1 Shear. & Redf., Neg., sec. 57; *Shaw v. Gold Mines Co.,* 77 Pac. 516; *Dobbins v. Brown,* 118 N. Y. 188; *Deserant v. Coal R. Co.,* 55 Pac. 290; *Traux v. Railroad,* 94 N. W. 442; *Neal v. Railroad,* 105 N. W. 199; *Reynolds v. Fibre Co.,* 59 Atl. 615; 2 Labatt, Mast. & Serv., sec. 837; *Savitz v. Railroad,* 48 Atl. 988; *Stratton v. Lumber Co.,* 81 Pac. 833; *Laidlaw v. Sage,* 158 N. Y. 73.)

Where the evidence is equally consistent with the absence as with the existence of negligence no recovery can be had. (*Fritz v. Electric Light Co.,* 18 Utah 493; *Baulic v. Railroad,* 59 N. Y. 356; *Electric Co. v. Kelly,* 57 N. J. L. 100, 29 Atl. 428; *Duffy v. Upton,* 113 Mass. 544; *Rose v. Railroad,* 58 N. Y. 217; *Bahr v. Lombard,* 53 N. J. Law 238, 21 Atl. 190; 2 Labatt, Mast. &. Serv., sec. 837; *Patton v. Railroad,* 179 U. S. 658.)

If some material·and necessary circumstance is left wholly unexplained ·by the evidence, the master is not liable. (*Murphy v. Railroad,* 68 Minn. 526, 71 N. W. 662; *Railroad v. Malaney,* 59 Ill. App. 114; *Donnelly v. Railroad,* 38 N. Y. Supp. 709; *Patton v. Railroad,* 179 U. S. 658; *Fritz v. Electric Light Co.,* 18 Utah 502.)

There is no evidence that the defendant, or any of its employees, left the switch unlocked. But even if such proof were made, the leaving of the switch unlocked was not the proximate cause of the death of the deceased. Even though the switch was unlocked prior to the accident, still it was perfectly safe unless and until it was manipulated by some human agency. If the wrongful act of a trespasser or intruder intervened before the accident and turned the switch and left it open, then the act of such trespasser or intruder was the sole proximate cause of the accident. The fact that the switch was unlocked was only a remote cause or condition. (*Railroad v. Trainor,* 33 Md. 542; *Insurance Co. v. Boon,* 95 U. S. 117; *Washington v. Railroad,* 17 W. Va. 190; *Mill Co. v. Standard Oil Co.,* 63 Fed. 400; *Claypool v. Wigmore,* 71 N. E. 509; *Railway v. Kellogg,* 94 U. S. 475; *Cole v. Savings & Loan Soc.,* 124 Fed. 113; *Smith v. County Court,* 8 L. R. A. 82; *Burt v. Newspaper Co.,* 154 Mass. 238; *Railroad v. Gaither,* 43 S. W. 266; *Mars v. Canal Co.,* 8 N. Y. Supp. 107; *Parker v. Cohoes,* 10 Hun 531, 74 N. Y. 610; *Shepherd v. Chelsea,* 4 Allen 113; *Jenks v. Wilbraham,* 11 Gray 142; *Mill Co. v. Standard Oil Co.,* 27 L. R. A. 583; *Cuff v. Railroad Co.,* 35 N. J. Law 17; *Barton v. Agricultural Society,* 83 Wis. 19; *Robinson v. Oregon Short Line,* 7 Utah 493; *Bevard v. Traction Co.,* 105 N. W. 635; *Stone v. Railroad,* 51 N. E. 1.)

The wrongful and unlawful act of a stranger in missplacing the switch could not create any liability against the defendant, unless the defendant was guilty of a subsequent breach of duty in failing to ascertain the existence of the dangerous condition, and such a breach of duty is neither alleged nor proven. (*Railroad v. Gaither,* 43 S. W. 268; *Stone v. Railroad,* 51 N. E. 1; *Richmond v. Railroad,* 40 N. Y. Supp.

812; *Railroad v. Slattery,* 57 Kan. 499, 46 Pac. 941; *Marcum v. Railroad,* 35 S. E. 423; *Connors v. Railroad,* 36 N. Y. Supp. 926; *Martin v. Railroad,* 26 S. W. 801; *Railroad v. Wittig,* 35 S. W. 859; *Newson v. Kimball,* 35 L. R. A. 135.)

## STATEMENT OF FACTS.

This action was brought by the heirs at law of George Edgar, deceased, to recover damages from defendant company for the alleged wrongful death of deceased, which occurred on the 5th day of July, 1905, at Park City, Utah. The complaint alleges that the deceased, on and prior to July 5, 1905, was a fireman in the employ of defendant company, and that on said day the engine on which he was riding was derailed by running into an open switch, thereby causing said engine to tip over and fall on its side, and thereby causing the death of said deceased, who was caught under the engine as it fell. It is further alleged "that said defendant company negligently and carelessly failed to keep said switch closed, in proper and safe condition so that cars would not leave the rails when passing over the same, and negligently failed to keep said switch locked, and negligently left said switch unlocked and open, and negligently failed to supply said switch with proper and safe signals, in that the signal maintained at said switch by said defendant company was too small, and the paint on the same was worn off and dingy and was dim and small, and that the same could not be seen by the said engineer or the said George Edgar, deceased, when employed as aforesaid in said engine." The answer of the defendant denies the negligence alleged in the complaint, and alleges that deceased was guilty of contributory negligence and that he assumed the risk of injury to himself in the manner alleged in the complaint. At the conclusion of the plaintiffs' evidence the court, on motion of defendant, granted a nonsuit. A motion for a new trial having been made and overruled, plaintiffs thereupon appealed to this court from the judgment of nonsuit.

The facts, as disclosed by the record, are as follows:

The deceased, at the time of the accident mentioned in the complaint, was, and for five years prior thereto had been, a locomotive fireman on the Park City branch of the defendant's railroad. The train on which he was employed was the regular passenger train running between Salt Lake City and Park City daily. The train left Salt Lake City each morning, and arrived at Park City at 10:50 o'clock in the forenoon, and departed daily on its return trip to Salt Lake City at 3:20 o'clock in the afternoon. This was the schedule run on July 5, 1905, the day on which the deceased met his death. On this day this particular train, in the switching operations, before it started on its return trip to Salt Lake City was run back and forth over the switch in question three times; the last time being about 11 o'clock in the forenoon. Each time when the train passed the switch and rails were in proper condition and were set and aligned for the safe passage of trains over the main line. After passing over the switch for the last time, the train was backed southward to the defendant's depot building, and there stopped, with the engine facing towards the north, ready to start for Salt Lake City at the usual time. The switch in question was about one thousand feet distant in a northerly direction. When the train pulled out, and had reached a point about 150 feet from the switch, the engineer, Joseph W. Bywater, for the first time noticed there was a break in the rails at that point, and he shouted to the deceased, "Jump George! the switch is wrong," and at the same time set the brake, reversed the engine, and opened its throttle. The deceased, when thus warned of the danger, leaped from the engine. The train could not be stopped, and as a result thereof the engine ran into the open switch, was derailed, and turned over onto its side, with the fireman, George Edgar, underneath, thereby crushing him to death.

The switch stand used to manipulate this switch was rotary or revolving stand, and stood five or six feet from the rails, and was used to throw the rails from one track to the other. It consisted of a pedestal of cast iron spiked or bolted to a tie which extended out from the track. There was a lever

attached to' the top above the pedestal, and on the pedestal was a disk, with slots in it, to permit the reception of the lever. By means of this lever the disk was revolved, and the lever dropped into one or the other of two slots. When the lever was in one position, the alignment of the rails was properly made for the main line, and when in another the continuity of the rails would cause a train going south to run onto a side track called the "house track." On this point Bywater, the engineer, testified in part as follows: "When the lever is there [in a slot] it is absolutely safe, even if the lock were unlocked. No train running over the rails could throw it out. . . . . I cannot recollect the exact amount of power required to lift it out of the south slot and then bring it around and drop it into the west slot. It requires an ordinary pull for a man to pull it around. I should say an exertion of probably fifty or seventy-five pounds—that would do it, I think. The force to pull this lever from the south clutch to the west clutch must move the rails." An indicator or disk, consisting of sheet iron and about ten or twelve inches in diameter, was attached to the switch stand. There was also a sheet iron or steel arrow, twelve or fourteen inches in length, which indicated the position of the rails. This arrow pointed in the direction in which the rails extended when adjusted or moved by the switch. When the arrow is at right angles with the main track, it means that the switch is turned, and that the continuity of the rails on the main line is broken. The switch in question was about one thousand feet from the Park City depot, and the disk or target, as well as the arrow, could, with the exception of a short distance, be seen by the fireman from the time the train left the depot until it arrived at the switch. The deceased was familiar with this switch and knew how it was manipulated. On this point Bywater, the engineer, testified as follows: "I have been running as locomtive engineer on the Park City branch about six years. Mr. Edgar fired for me nearly five years, and was on duty practically all the time. Each time we went up to Park City on the engine he passed this switch. . . . Except for a few days he was laying off, Mr. Edgar passed that switch every

day in the year, including Sundays, for five years. He knew what kind of a switch stand it was. . . . We would pass it six or eight times a day with Mr. Edgar on the engine. . . . I have seen him unlock that switch and manipulate it on numerous occasions prior to the accident." Oscar Cunnington, a boy eight years of age, testified that he passed by the switch stand between 8 and 9 o'clock in the morning of the day of the accident and that he observed that the lock in the switch stand was unlocked; that he removed the lock, examined it, and then replaced it in its proper position.

The members of the different train crews on this branch road and all station employees were furnished with keys which would lock and unlock said switch. The evidence, however, shows that none of the train crew of the train in question used, or had occasion to use, the switch, or to unlock or manipulate it, on the day of the accident, nor for three or four days prior thereto. Bywater, the engineer, testified: "From the last time we backed up to the depot platform there was not, to my knowledge, a Rio Grande Western employee in Park City that day that had any duty to perform about that switch. My engine was the only Rio Grande engine there, and if there had been any cars to be handled, to be put on the house track there at all, it would have to be done by my engine. Our crew was the only train crew there besides the agent. No member of my crew had any duty to perform about or around the switch after we passed it at 11 o'clock. All our work was over the main line. All that was necessary for us to do was to leave the switch as we first found it in the morning in order to do what we had to do." It further appeared that some three years prior to the date of the accident the defendant company had furnished the agent of the Union Pacific Railway Company at the Park City station a key to said switch, and gave the said Union Pacific Railway Company permission to use said switch and the railroad tracks of defendant company in transferring cars from one road to the other, and at about 9 o'clock on the morning of July 5, 1905, the day on which the accident occurred, the employees of the Union Pacific Railway Company procured the key from the agent,

and, after using the switch and tracks in question, returned the key to the agent at about 9:30 o'clock that same forenoon.

McCARTY, C. J., after stating the facts, delivered the opinion of the court.

While it is alleged in the complaint that the respondent (defendant company) failed to keep and maintain, at the switch where the accident occurred which caused the death of the deceased, George Edgar, proper signals indicating whether the switch was opened or closed, no evidence was offered in support of this allegation; but, on the contrary, the evidence introduced with respect to the indicators, which consisted of a disk and arrow attached to the switch stand, tended to show that they in every respected fully answered the purposes for which they were intended, and that the accident was in no manner due to their alleged imperfect condition. In fact, the evidence, as the record now stands, shows that the switch stand and the tracks with which it was connected were in good condition and in perfect working order. We shall therefore confine our consideration of the case to the question as to whether or not the position of the switch at the time of the acciddent was due to the negligence of respondent company.

While it may be fairly inferred from the evidence that some person in the employ of the respondent, or some party to whom it had intrusted one of its keys to the switch, left the switch unlocked, yet there is a total want of evidence to support a finding that the switch was left open either by respondent or by any person who, with respondent's consent, used the switch or carried one of the keys thereto. The only use made of the track in question on the day of the accident, after the train on which the deceased was fireman reached Park City and before it started on its return trip to Salt Lake City, was in the switching operations of this particular train, during which time it passed over the switch where the derailment took place three times; the last time being about 11 o'clock in the forenoon. On this point witness Bywater testified, and his testimony is not disputed: "We passed that switch before

32 Utah—22

the accident on that day about three times, and everything
appeared to be all right. The rails were continuous for the
main line on each of these occasions. Before the accident
we passed over the switch about 11o'clock the last time, and
the rails were safe for the passage of the train. There was
nothing to indicate that there was anything wrong with the
track." And again he says, referring to the switch: "I did
not manipulate it on that day at all. We had no occasion to
use the house track on that day. . . . All our work
was done over the main line."

  Counsel for appellants, in their brief, say: "It is certain
that the switch was open. It is equally certain that some one
was responsible for its condition. From this evidence there
must be one of three inferences deduced as to who was respon-
sible for the open switch. It was either the defendant com-
pany, the deceased, or some third person. One or the other
of these inferences must necessarily arise from the proven
facts that the switch was unlocked and that the switch was
open." And then, by way of argument, they say: "While
it might be said that either one inference or the other might
be deduced from the evidence by a reasonable person, still
it seems to us that the inference that the defendant company
was responsible is the more reasonable." It will be seen that
it is practically conceded that the question as to whether de-
fendant company or some other party left the switch open is
a matter of conjecture and speculation. The evidence to
which we have referred, however, instead of pointing to either
defendant company or to the deceased, rather tends to show
that neither of them was responsible for the open switch.
Therefore the allegation in the complaint that the defendant
left the switch open remains wholly unproved. It was not
sufficient for appellants to show that defendant company may
have been guilty of this particular act of negligence. It was
incumbent upon appellants to produce some substantial evi-
dence which would at least tend to fasten the blame on defend-
ant for the misplaced switch which caused the accident. Where
as in this case, the evidence leaves the matter uncertain as to
whether the defendant or some unknown party is responsi-

ble for the act of negligence alleged, a recovery cannot be had. In the case of *Patton v. Texas & P. R. Co.*, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, Justice Brewer, speaking for the court says:

"It is not sufficient for the employee to show that the employer may have been guilty of negligence. The evidence must point to the fact that he was. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes, and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion." (2 Labatt, Mast. & Serv., 837; *Fritz v. Electric Light Co.*, 18 Utah 493, 56 Pac. 90; *Sorenson v. Menasha Paper & Pulp Co.*, 56 Wis. 338, 14 N. W. 446; *Deserant v. Coal R. Co.*, 55 Pac. 290, 9 N. W. 495; *Shaw v. New Year Gold Min. Co.*, 77 Pac. 515, 31 Mont. 138; *Dobbins v. Brown et al.*, 119 N. Y. 188, 23 N. E. 537.)

The important question, therefore, is: Was the leaving of the switch unlocked the proximate cause of the derailment of the engine in question? We think this question must be answered in the negative. The evidence, we think, conclusively shows that the unlocked condition of the switch was not the proximate cause of the death of the deceased, nor did it in any manner contribute thereto. The record shows that, before the continuity of the rails on the main line was broken by the misplacement of the switch between 11 o'clock a. m. and 3:20 o'clock p. m. on the day in question, the main track where it passed the switch was "absolutely safe, even if the lock were unlocked, so far as the trains passing over it was concerned;" that "no train running over the rails could throw it out;" and that it would require an exertion equivalent to from "fifty to seventy-five pounds" to throw open the switch and thereby break the continuity of the rails on the main line. Under these conditions it is evident that the unlocking of the switch and leaving it in that condition could not in any degree have rendered the track dangerous or unsafe for the passage of trains; for, had it not been for the subsequent and independent act by which the switch was turned and the continuity of the rails on the main track there-

by broken, the accident in all probability would not have happened. In other words, there was not such an unbroken connection between the leaving of the switch unlocked and the subsequent misplacement of the rails as to make it one continuous operation. And even if it be assumed, for the purposes of this case, that the unlocking of the switch in the first instance was a cause without which the accident would not have occurred, it was at most a remote cause; the direct and proximate cause of the accident being the subsequent misplacement of the switch.

The law is well settled that an act or omission, in order to constitute negligence for which an action will lie, must directly, as its natural consequence, produce injury to another. Cooley, in his work on Torts (2d Ed., pp. 73-76), says:

"It is not only requisite that damage actual or inferential, should be suffered, but this damage must be the legitimate sequence of the thing amiss. The maxim of the law here applicable is that in law the immediate, and not the remote, cause of any event is regarded, and in the application of it the law rejects, as not constituting the foundation for an action, that damage which does not flow proximately from the act complained of. In other words, the law always refers the injury to the proximate, not the remote cause. The explanation of this maxim may be given thus: If an injury has resulted in consequence of a certain wrongful act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last proximate cause, and refuse to trace it to that which was more remote." Continuing, the author says: "A writer on this subject has stated the rule in the following language: If the wrongs and the resulting damage are not known by common experience to be naturally and usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, then the wrong and the damage are not sufficiently conjoined or concatenated as cause and effect to support an action."

In the case of *Insurance Co. v. Boon,* 95 U. S. 130, 24 L. Ed. 395, it is said:

"The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones."

In the case of *Railway Co. v. Kellogg,* 94 U. S. 469, 24 L. Ed. 256, the court says:

"The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation?  Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? . . . It is generally held that in order to warrant a finding that negligence, or an act not amounting to a wanton wrong, is the proximate cause of the injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of attending circumstances." (*Goodlander Mill Co. v. Standard Oil Co.*, 63 Fed. 400, 11 C. C. A., 253, 27 L. R. A., 583; Bailey on Mast. Liab. to Serv., p. 420; *Cole v. German Sav. & Loan Soc.*, 124 Fed. 113, 59 C. C. A., 593, 63 L. R. A., 416; *Claypool v. Wigmore*, 71 N. E. 509, 34 Ind. App. 35; *Smith v. County Court* (W. Va.), 8 L. R. A. 82, and cases cited in note; *Afflick v. Bates*, 43 Atl. 539, 21 R. I. 281.)

Applying the law as declared by the foregoing authorities to the facts in this case, we are clearly of the opinion that the leaving of the switch unlocked was not the proximate cause, nor was it a concurring cause, of the accident; and, as the evidence fails to show that the defendant company displaced and left the switch open on the occasion referred to, the trial court did not err in granting defendant's motion for a nonsuit.

The judgment is affirmed, with costs.

FRICK, J., concurs.

STRAUP, J. I think the decisive question is insufficiency of evidence to charge the defendant with the commission of the acts of negligence alleged in the complaint, rather than the proximate or intervening cause of injury. On that ground I concur in the judgment of affirmance.